REGIONS BANK d/b/a Regions
Funding, Plaintiff,

v.

WIEDER & MASTROIANNI, P.C. and
Peter Mastroianni, Defendants/Third–
Party Plaintiffs,

v.

Morning Star Mortgage Bankers, Inc.
and Angela Daidone, the Provident
Bank, d/b/a Provident Consumer Fi-
nancial Services, Inc., Third–Party De-
fendants.

No. 01 CIV. 0016(WCC).

United States District Court,
S.D. New York.

Nov. 7, 2001.

Certilman Balin Adler & Hyman, LLP,
East Meadow, NY (Thomas J. McNamara,
Esq., Of Counsel), for Plaintiff.

Wilson, Elser, Moskowitz, Edelman &
Dicker, New York City (Mark K. Anesh,

Esq., Christian T. Novay, Esq., Of Counsel), for Defendants/Third–Party Plaintiffs,

Buchanan Ingersoll, Professional Corporation, New York City (William M. O'Connor, Esq., Donna L. Menghini, Esq., Of Counsel), Keating, Muething & Klekamp, P.L.L., Cincinnati, OH (James E. Burke, Esq., Of Counsel), for Third–Party Defendant The Provident Bank d/b/a Provident Consumer Financial Services, Inc.

### *OPINION AND ORDER*

WILLIAM C. CONNER, Senior District Judge.

Regions Bank d/b/a Regions Funding ("Regions") brought the instant action against defendants Wieder & Mastroianni, P.C. and Peter Mastroianni (collectively "W & M"), alleging, *inter alia,* wrongful conversion of funds and breach of fiduciary duty. W & M then filed a Third–Party Complaint against The Provident Bank, Inc. d/b/a Provident Consumer Financial Services, Inc. ("Provident"), Morning Star Mortgage Bankers, Inc., and Angela Daidone ("Daidone") (collectively "Morning Star"). Third-party defendant Provident now moves to dismiss W & M's Third–Party Complaint pursuant to FED. R. CIV. P. 12(b)(6) or, in the alternative, to stay or dismiss this action in favor of an earlier filed action in the Northern District of Georgia. For the reasons stated below, Provident's motion is granted in part.

### BACKGROUND [1]

The instant action arises from a series of fraudulent banking transactions initiated by Morning Star through its president and chief executive officer Daidone. Morning Star was in the business of originating residential mortgage loans. In order to obtain funding for these loans, Morning Star arranged lines of credit with financial institutions called "warehouse lenders." (Complt. ¶ 15.) A warehouse lender provides short-term funding for home buyers through approved mortgage brokers. A mortgage broker such as Morning Star obtains loan funds on behalf of its customers from a "warehouse line of credit" established with the warehouse lender. The mortgage note resulting from such transactions is usually sold to other financial institutions soon after close of the sale of property that is subject to the mortgage. Upon sale of the mortgage note to an investor, the warehouse lender is typically repaid the amount owing on the note by the mortgage broker.

Regions, the initial plaintiff in this action, is in the business of providing warehouse loans. (Complt. ¶ 6.) On April 4, 2000, Regions and Morning Star entered into a Warehouse Security Agreement and warehouse line of credit. (*Id.* ¶ 9.) According to the agreement, Regions would fund mortgage loans originated by Morning Star. The funding of loans specified by Morning Star was effectuated by Regions's wire transferring the requested amount into the escrow account of Morning Star's settlement agent, defendant W & M. (*Id.* ¶¶ 9–11.) The funds transferred into W & M's escrow account on behalf of Morning Star were to be used to fund previously specified underlying loans. (3d-Party Complt. ¶ 13.)

Between April 10 and April 12, 2000, in three separate transactions, Regions advanced a total of $798,720 to W & M's escrow account for the purpose of funding loans specified by Morning Star. (Complt. ¶¶ 15–25.) In the first transaction on April 10, 2000, Regions transferred a sum

---

1. For the purposes of this motion, the facts have been gleaned from the Complaint, the Third–Party Complaint and the Third–Party

Plaintiffs' Memorandum of Law in Opposition to the Third–Party Defendant's Motion to Dismiss.

of $171,720 to W & M's escrow account for the alleged purpose of funding a loan to Mr. Aguado ("Aguado loan")[2]. Again, on April 12, 2000, Regions transferred a second sum of $465,000 to W & M's escrow account for the purpose of funding a loan to Mrs. Crawford ("Crawford loan"). Finally, on April 13, Regions transferred a sum of $162,000 to W & M's escrow account for the purpose of funding a loan to Mr. Graziosi ("Graziosi loan"). W & M received instructions as to the loans and the amounts wired into the escrow account from Morning Star. (3d-Party Complt. ¶¶ 14–17.)

On April 10, 2000, Daidone notified W & M by fax that the Aguado loan was not going to close and that the money for that loan was sent in error. Daidone instructed W & M to return the funds to Provident, falsely stating that Provident was the warehouse lender and originator of the loan. Daidone provided wiring and account numbers. (*Id.* ¶¶ 18, 21.) Pursuant to this instruction and allegedly in ignorance, W & M transferred the funds to Morning Star's private account at Provident on April 11, 2000.[3] (*Id.* ¶ 20; Complt. ¶ 31.) On April 12, 2000, Daidone contacted W & M, advising that there was an error with respect to the Crawford and Graziosi loans, and again instructing W & M to wire the funds to Provident. (3d-Party Complt. ¶ 21.) W & M complied with this request. As a result of these transactions, W & M transferred the $798,720 that Regions advanced on behalf of Morning Star to Morning Star's account at Provident.

Soon after the transfer of the above funds to Provident, Regions contacted W & M and allegedly informed W & M for the first time that the funds originated from Regions and not from Provident. (*Id.* ¶ 22.) In response, W & M instructed Provident to wire the funds back to the escrow account so that they could be returned to Regions. Provident refused. (*Id.* ¶ 24.)

The FBI began investigating Morning Star's activities sometime prior to April 4, 2000.[4] The investigation revealed that Morning Star defrauded Provident of approximately $1,800,000 either by pledging no collateral to obtain loans, or by pledging collateral which it had already pledged to secure funds from another warehouse lender. (*Id.* ¶ 28.) The FBI investigation also revealed that Morning Star had secured funds for loans by submitting fraudulent documents. (*Id.* ¶ 29.) Provident allegedly learned of potentially fraudulent activity by Morning Star sometime around April 4, 2000, and shortly thereafter demanded repayment of the $1,800,000 outstanding on Morning Star's line of credit (*Id.* ¶¶ 30, 31.) The FBI's investigation of Morning Star also revealed that the com-

---

**2.** In its Complaint, Regions alleges that each loan contained specific wiring instructions, including "the amount to be wired, the specific investor for each Loan being funded, the specific underlying loan number for each Loan being funded, and the account to which the funds would be wired to." (Complt.¶ 12.)

**3.** W & M alleges that it did not learn that the money was transferred to Morning Star's private account, rather than a warehouse account, until after they were contacted by Regions.

**4.** There are conflicting statements concerning the time that the FBI investigation commenced. The Third–Party Complaint states that the investigation began on April 4, 2000. (3d-Party Complt. ¶ 27.) However, given the later allegations in the Complaint (e.g. that Provident was made aware of potential fraud by the FBI "on or about April 4, 2000" (*id.* ¶ 30)), it is clear that the investigation began before April 4, 2000.

pany had fraudulently obtained funds from Regions.[5] (*Id.* ¶ 32.)

On or about April 13, 2000, Daidone instructed Provident to remove the funds in her private account and apply them as a set-off to the $1,800,000 warehouse line of credit held by Morning Star. (3d-Party Complt. ¶ 25.) Although allegedly aware of potential fraud by Morning Star, Provident withdrew the funds and applied them as a set-off to Morning Star's line of credit. (*Id.* ¶ 26.)

On June 30, 2000, Regions filed a complaint in the United States District Court for the Northern District of Georgia, Atlanta Division (docket number 1 00–CV–1646) ("Georgia action"), against Provident and Morning Star alleging, *inter alia,* unjust enrichment, conversion and receipt of stolen property by Provident, and breach of contract, breach of legal duty, conversion and fraud by Morning Star. That action is ongoing. On January 8, 2001, Regions filed this action in the Southern District of New York against W & M.[6] W & M then filed a Third–Party Complaint against Provident and Morning Star, seeking contribution for any judgment Regions recovered against W & M.

## DISCUSSION

### I. *Dismissal or Stay in Favor of a First–Filed Action*

█ The Supreme Court has recognized that "the power to stay proceedings is incidental to the power in every court to control the disposition of the causes on its docket." *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). In order to promote judicial economy, if competing cases are filed in two federal courts, "the general principle is to avoid duplicative litigation." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

█ In keeping with this general principle, the Second Circuit has long followed the "first-filed rule" in deciding whether a case should be stayed or dismissed in favor of a case pending in another federal court. *See William Gluckin & Co. v. International Playtex Corp.,* 407 F.2d 177, 178 (2d Cir.1969); *Mattel, Inc. v. Louis Marx & Co.,* 353 F.2d 421, 423 (2d Cir.1965). Under this rule, where two actions involve substantially the same issues, "the first suit should have priority, 'absent the showing of a balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second.'" *William Gluckin & Co.,* 407 F.2d at 178 (quoting *Remington Prods. Corp. v. American Aerovap, Inc.,* 192 F.2d 872, 873 (2d Cir. 1951)); *Berisford Capital Corp. v. Central States, Southeast and Southwest Areas Pension Fund,* 677 F.Supp. 220, 222 (S.D.N.Y.1988). The purposes of this rule are to "avoid duplication of judicial effort, avoid vexatious litigation in multiple forums, achieve comprehensive disposition of litigation among parties over related issues, and eliminate the risk of inconsistent adjudication." *Marshak v. Reed,* 2001 WL 668656, *2, 13 Fed.Appx. 19 (2d Cir.2001). Ultimately, "[t]he decision whether or not to stay or dismiss a proceeding rests within a district judge's discretion." *Adam v. Jacobs,* 950 F.2d 89, 92 (2d Cir.1991) (citing *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.,* 342 U.S. 180, 183–84, 72 S.Ct. 219, 96 L.Ed. 200 (1952)).

---

**5.** The pleadings are unclear as to when the FBI actually began investigating Morning Star's activities with respect to Regions.

**6.** W & M is evidently not subject to the jurisdiction of the Georgia court.

## II. First–Filed Rule in the Instant Action

■ Provident argues that this Court should stay or dismiss the entire second-filed action, or, alternatively, the Third–Party Complaint, in favor of the Georgia action under the first-filed rule. (3d Party Def. Mem. Supp. Mot. Dismiss at 7.) W & M, on the other hand, argues that a stay of the Third–Party Complaint is inappropriate because their complaint involves issues and parties different from the Georgia action.[7] Regions also responds to Provident's motion for a stay, arguing that because W & M is not amenable to suit in Georgia, this Court should not stay the original complaint.

We first consider a stay of W & M's Third–Party Complaint, the primary focus of Provident's motion to dismiss. W & M's claim for contribution from Provident involves the same issues as Regions's claims against Provident in the Georgia action. Both ultimately turn on a determination of Provident's culpability in the transactions at issue. In their pleadings, W & M acknowledges that their claim for contribution rests on finding Provident liable for the damages suffered by Regions. "The basic requirement for contribution is that the culpable parties must be subject to liability for damages for the same injury to property...." (3d-Party Pls. Mem. Opp. Mot. Dismiss at 4.) W & M's basic argument in favor of contribution is that Provident is responsible for a share of the damages suffered by Regions.[8] This is precisely the issue before the Georgia court. Litigating Provident's liability to Regions would only duplicate the work of the Georgia court. Staying the Third–Party Complaint would therefore promote the principles of "judicial economy and comprehensive disposition of litigation." Curtis v. Citibank, 226 F.3d 133, 138 (2d Cir.2000) (quoting Kerotest, 342 U.S. at 183, 72 S.Ct. 219). It would also protect Provident from the considerable expense and vexation of duplicative litigation. See Adam, 950 F.2d at 93; Kellen Co., Inc. v. Calphalon Corp., 54 F.Supp.2d 218, 221 (S.D.N.Y.1999) (citation omitted).[9]

We also find that the interests of judicial economy weigh in favor of staying the entire action before this Court. If Regions succeeds against Provident in the Georgia action, a decision in this Court will be rendered unnecessary. A finding of liability on the part of Provident in Georgia will allow Regions to collect the entire amount transferred in the transactions at issue and will eliminate the need to proceed against W & M. In that event, if this action has not been stayed pending resolution of the Georgia action, the parties to this action will have wasted considerable time and money and there will have been

---

7. Although arguing that a stay is inappropriate, W & M consents to a stay if it involves the entire action before this Court. (3d-Party Pls. Mem. Opp. Mot. Dismiss at 14.)

8. W & M further frames the issue before this Court as "whether Provident & W & M *are liable to Regions,* thus allowing W & M to seek contribution from Provident ...." (3d-Party Pls. Mem. Opp. Mot. Dismiss at 6 (emphasis added)).

9. W & M also argues that this Court does not have jurisdiction to apply the first-filed rule.

(3d-Party Pls. Mem. Opp. Mot. Dismiss at 11.) This argument is flawed. The cases that W & M points to in support of their argument discuss the issuing of an *injunction* against another federal court. In this case, we merely consider whether it is appropriate for us to stay the action before our own Court. Our decision in no way impacts the proceeding before the Georgia court. Contrary to W & M's argument, the discretion to stay a proceeding is inherent in this Court's power. See Landis, 299 U.S. at 254, 57 S.Ct. 163.

an unnecessary imposition on the limited resources of this Court.

 Regions argues that this Court should not stay the entire action because they can not make W & M a party in the Georgia action. (Pl. Mem. Opp. Mot. Dismiss at 3–4.) However, we note that the first-filed rule may apply even if the two actions at issue involve different parties. *See Marshak*, 2000 WL 668656, at *3, 13 Fed.Appx. 19 ("An injunction may properly issue to effectuate the policies of the first-filed rule even where the parties are not identical.") (internal quotations omitted). We also point out that a finding of no liability for Provident in the Georgia action will not subsequently bar Regions from proceeding here against W & M. Because W & M is not a party in the Georgia action, and the claims against W & M differ from those against Provident, a decision in that court will not estop Regions from litigating its claims against W & M before this Court in the future.[10] In issuing a stay, we do not remove this action from our docket, but merely await a decision in the first-filed action that could render this action unnecessary. Any prejudice resulting from such delay is greatly outweighed by considerations of judicial economy and avoiding unnecessary litigation expenses for the parties.

## CONCLUSION

For the reasons stated above, the portion of Provident's motion seeking to stay the entire action before this Court pending the determination of *Regions Bank v. Provident Bank, Inc. et al.*, 1 00–CV–1646, in the Northern District of Georgia, is granted. We do not reach the merits of

Provident's motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) at this time.

SO ORDERED.

---

10. Similarly, a finding of no liability for Provident in the Georgia action will not estop W & M from litigating the contribution claims against Provident contained in their Third–Party Complaint.